# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THE WILLIAM POWELL COMPANY,

                Plaintiff,

      v.

AVIVA INSURANCE LIMITED, et al.,

                Defendants.

Case No. 1:21-cv-522

Hopkins, J.
Bowman, M.J.

## REPORT AND RECOMMENDATION

Chief U.S. District Judge Algenon L. Marbley[1] recently referred a pending motion to dismiss in this case to the undersigned magistrate judge.[2] (Doc. 117). Although oral argument was requested, the undersigned has determined that oral argument is unnecessary for resolution of the motion. For the reasons that follow, Defendant's motion to dismiss (Doc. 56) should be DENIED.

## I.    Background

Plaintiff, The William Powell Company ("Powell"), bought insurance policies in Ohio between 1955 and 1977 ("Policies") in order to insure itself against liabilities associated with the use of asbestos. This case arises from past and ongoing claims made against

---

[1]On September 7, 2024. U.S. District Judge Sarah D. Morrison became Chief Judge of the Southern District of Ohio.
[2]Previously, on June 20, 2023, the presiding district judge had referred the resolution of only non-dispositive matters to the undersigned. (Doc. 103).

Powell for tens of millions of dollars in asbestos-related personal injuries ("asbestos litigation") and Powell's attempts to obtain defense and indemnity insurance coverage under its Policies. The name of the insurer listed on the Policies is General Accident Fire and Life Assurance Corporation, Limited. ("General Accident"), an alien insurer based in the United Kingdom. Consistent with the face of the Policies, Powell alleges that it contracted with General Accident.

A lot has changed in the world in the nearly seven decades since Powell purchased its first Policies. Relevant here, General Accident has undergone corporate restructuring and multiple name changes. Several years after the last policy was issued, in 1981, General Accident entered into a domestication agreement for its U.S. business, selling its U.S. based assets to Potomac Insurance Company ("Potomac"), a wholly owned American subsidiary. In exchange, Potomac assumed General Accident's liabilities, including liabilities under the Policies. Potomac then changed its name to General Accident Ins. Co. of America. (Doc. 43-3, PageID 636). Eventually, that entity became Bedivere Insurance Company ("Bedivere").

Between 2001 through mid-2019, Powell accepted and received coverage for the asbestos litigation under the Policies from Bedivere, the current name of the corporation that had assumed General Accident's U.S. based liabilities when General Accident transferred its U.S. assets to Potomac. (Doc. 43 at ¶¶38-41). But Bedivere ran out of money in 2019, leaving "approximately $27 million in remaining indemnity limits under the Policies, and at least double that amount in remaining defense dollars." (*See id.* ¶ 43).

The State of Pennsylvania placed Bedivere into liquidation proceedings on March 11, 2021. Faced with an insolvent Bedivere, Powell began to look for deeper pockets.

On August 16, 2021, Powell first filed suit against Aviva Insurance Limited ("Aviva"), and two closely-related insurers, alleging that Aviva was essentially the same insurer as the original U.K. based General Accident and therefore liable under the Policies in addition to Bedivere. After the insurers moved to dismiss, Powell filed an amended complaint that omitted the related defendants but kept Aviva.[3] (*See* Doc. 43).

Aviva filed a new motion to dismiss Powell's amended complaint. Briefing was completed on March 7, 2022. But on August 11, 2023, the Court permitted Aviva to file supplemental exhibits, to which Powell was then permitted to file a sur-reply. (Doc. 109). The pending motion to dismiss was referred to the undersigned on July 24, 2024.[4]

Aviva seeks dismissal under Rule 12(b)(2) for lack of personal jurisdiction. In the alternative, Aviva seeks dismissal under Rule 12(b)(6) for failure to state a claim, or to stay proceedings based on the ongoing liquidation of Bedivere in Pennsylvania. According to Aviva, General Accident itself never contracted with Powell. Instead, Aviva insists that the Selling Insurer was a separate affiliated entity called its U.S. Branch ("US Branch").

---

[3]Four additional insurers are named as nominal parties, including United States Fire Ins. Co., Hartford Accident and Indemnity Co., Great American Ins. Co. of New York and Great American E&S Ins. Co., and State Auto Mutual Ins. Co. (together the "Settling Insurers."). Powell asserts no claims against the Settling Insurers because all made payments under their own policies pursuant to a Settlement and Allocation Agreement with Powell. All Settling Insurers have filed cross-claims for subrogation and/or contribution against Aviva. (*See* Doc. 43 at ¶49, Docs. 44, 45, 48, 65). State Farm's answer and cross-claims were filed *after* Aviva filed its second motion to dismiss.

[4]The undersigned regrets the confluence of factors that have led to delays in resolution of the long-pending motion to dismiss.

## II. Analysis

Despite the fact that this lawsuit was filed more than three years ago, it remains in its infancy. From the outset, Aviva has vigorously resisted participating in any type of discovery, or even in a preliminary Rule 26(f) conference, reasoning that it had no liability because Powell has simply sued the wrong insurer. Although the undersigned directed Aviva to participate in the Rule 26(f) conference, the Court ultimately was persuaded to deny Powell's motion to compel discovery and to grant Aviva's hard-fought motion to stay pending resolution of its motion to dismiss. (*See* Doc. 109). Aviva insisted at the time that a stay was appropriate because its pending motion to dismiss was based on three purely legal grounds: (1) a lack of personal jurisdiction under Rule 12(b)(2); (2) a failure to state a claim under Rule 12(b)(6); and (3) *Burford* Abstention. (*See* Doc. 95, PageID 1662, arguing that "[n]o discovery is required to determine the questions raised by the Motion to Dismiss."). Given the lack of discovery to date, defining the scope of review and the parties' respective burdens under the relevant provisions of Rule 12, Fed. R. Civ. P., is critical.

### A. Aviva's Rule 12(b)(2) Challenge to Personal Jurisdiction

Aviva's motion to dismiss presents a threshold challenge to this Court's exercise of personal jurisdiction under Rule 12(b)(2), Fed. R. Civ. P. Unlike Rule 12(b)(6) which limits the scope of review to the pleadings, a motion filed under Rule 12(b)(2) requires this Court to review *some* evidence. "[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*,

4

935 F.2d 1454, 1458 (6th Cir. 1991) (additional citation omitted). Because a court must consider jurisdictional facts established by evidence, "[t]he court's treatment of a motion under Rule 12(b)(2) mirrors in some respects the procedural treatment given to a motion for summary judgment under Rule 56." *Id.*, 935 F.2d at 1459.

But as the Sixth Circuit has explained, a trial court has discretion on precisely how much evidence to consider, and in what format:

> Presented with a properly supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions. *Serras* [*v. First Tenn. Bank Nat. Ass'n,* 875 F.2d 1212, 1214 (6th Cir. 1989)]. The court has discretion to select which method it will follow, and will only be reversed for abuse of that discretion. *See Michigan Nat. Bank v. Quality Dinette, Inc.,* 888 F.2d 462, 466 (6th Cir.1989); *Serras,* 875 F.2d 1214. However, the method selected will affect the burden of proof the plaintiff must bear to avoid dismissal. *Serras,* 875 F.2d at 1214. …Where the court relies solely on the parties' affidavits to reach its decision, the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.

*Theunissen*, 935 F.2d at 1458 (additional citations omitted).

The Court's August 11, 2023 Order granting Aviva's construed motion for a stay of discovery pending resolution of Aviva's motion to dismiss pointed out that both Aviva and Powell initially agreed that Aviva's pending motion to dismiss could be resolved without substantive discovery. (Doc. 109 at PageID 1925). However, in its opposition to Aviva's motion to stay discovery and in support of a separate motion to compel, Powell alternatively asserted that Aviva's motion to dismiss strayed too far beyond evidence that

could be supported by affidavits alone, and therefore required jurisdictional and merits-based discovery.

The Court granted Aviva's motion to stay such discovery after reasoning that "[i]f Powell's arguments are correct, then the Court will deny Aviva's motion to dismiss and the broad discovery [Powell] seeks on the merits may well be appropriate." (Doc. 109, PageID 1925). In short, because Aviva prevailed on its motion to stay even jurisdictional discovery, this Court is limited to a review of the affidavits, and Powell need only make a *prima facie* showing that personal jurisdiction exists. *Theunissen*, 935 F.2d at 1458-1459. "Where, as here, the district court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) motion, rather than resolving the motion after either an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight.'" *Air Products and Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn,* 839 F.2d 1164, 1169 (6th Cir.1988)). Moreover, the Court "must view the pleadings and affidavits in a light most favorable to the plaintiff and not weigh 'the controverting assertions of the party seeking dismissal.'" *Peters Broadcast Engineering, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 438 (6th Cir. 2022) (quoting *Ingram Barge*, 3 F.4th at 278 (additional citation omitted)).

Under Ohio Rev. Code §2307.382(A)(9), Powell may make its prima facie showing if it can demonstrate that Aviva is a successor to the company that contracted "to insure any person, property, or risk located within this state at the time of contracting." But §2307.382(C) also permits this Court to "exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." Under

6

well-established constitutional standards, the Due Process Clause mandates that a non-resident defendant "have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 66 S.Ct. 154, 158, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343 (1940)). In the Sixth Circuit, those "traditional notions of fair play" generally require three things:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 649 (6th Cir. 2016) (quoting *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). On the limited record presented here, Powell has met its "slight burden" to demonstrate its *prima facie* case that specific personal jurisdiction exists under both Ohio law and Due Process standards.[5]

### 1.  The Amended Complaint Alleges Personal Jurisdiction

Aviva contends that the allegations of the amended complaint are facially insufficient to establish the existence of personal jurisdiction over Aviva. I disagree.

The amended complaint alleges that between 2001 through mid-2019, Powell received coverage from Bedivere Insurance Company as an admitted successor to the

---

[5]Aviva argues, and Powell does not dispute, that there is no evidence that General Accident engaged in the type of continuous and systematic contacts in Ohio that would support the existence of general personal jurisdiction. Therefore, the Court's analysis focuses on specific personal jurisdiction.

Selling Insurer. (Doc. 43 at ¶¶38-41). But Powell clearly identifies the Selling Insurer as General Accident, an alleged "global" insurance company based in Scotland that "sold policies in the United States to policyholders in its own name and in the name of certain of its wholly owned subsidiaries." (*Id*. ¶¶ 28-29; *see also id.* ¶¶2, 20). The amended complaint further alleges that "General Accident issued the Policies to Powell directly." (*Id.*, ¶29). Copies of the Policies attached to the complaint agree with this allegation, insofar as they reflect the Selling Insurer's name as "General Accident Fire and Life Assurance Corp. Ltd." (Doc. 43-1).

The complaint states that General Accident underwent several name changes, re-registering as General Accident and Life Assurance Corporation plc, a United Kingdom based entity in 1982, and changing its name to CGU Insurance plc in 1999. In 2006, CGU Insurance plc re-registered as Aviva. (*Id.*, ¶ 34). According to Powell, the name changes did nothing to change the fact that "Aviva is General Accident" and is "the same entity that issued the Polices to Powell." (*Id.*, ¶ 35). In other words, Powell has pleaded that General Accident is the exact same company as Aviva and vice versa, with the only pertinent distinction being the evolution of Defendant's name over the past few decades, and that Aviva (f/k/a General Accident) is the Selling Insurer as listed on the Policies.

The referenced allegations are sufficient to allege personal jurisdiction against Aviva to the extent that General Accident is now known as Aviva. Because it has changed only in name, Aviva is the same entity and considered a successor. "[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject

8

to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir.2008) (quoting *Patin v. Thoroughbred Power Boats Inc*., 294 F.3d 640, 653 (5th Cir. 2002)).

### 2. Aviva's Declarations do not Defeat Personal Jurisdiction

Aviva's Rule 12(b)(2) motion and Declarations attempt to defeat personal jurisdiction through two assertions of fact that contradict Powell's allegations. According to Aviva, its US Branch and not General Accident was the Selling Insurer, and Bedivere was the sole successor to the US Branch. (See Docs.56-58).

In Declarations filed in support of its motion, Aviva admits that it "was formerly known as General Accident Fire and Life Assurance Corporation, Limited (registered number SC002116)," an entity "established under UK law in or around 1891," that was "re-registered as General Accident Fire and Life Assurance Corp. plc" in or around 1982. (Doc. 57, ¶1 at PageID 773). Aviva further concedes that around 1999, General Accident underwent another name change, to "CGU Insurance plc.," and that around 2006, the name was re-registered (with the same registration number) as Aviva. (*Id*. at PageID 773-774). In other words, Aviva agrees with Powell's assertion that it is the same entity as General Accident.

But beyond that point, Aviva's agreement ends. According to Aviva, neither Aviva nor its predecessor-in-name, General Accident, entered into contracts of insurance coverage with Powell under the Policies. Instead, the Declarations state that in order to

conduct insurance business in the United States, General Accident established a separate entity, the US Branch, around the year 1899 pursuant to New York Insurance Law. (Doc. 57, ¶ 2, PageID 774). Aviva admits that General Accident/Aviva was "affiliated with" the US Branch at the time the Policies took effect, (Doc. 56, PageID 734). But Aviva insists that its US Branch should be treated as a separate legal entity that contracted with Powell on the Policies, meaning that General Accident was not itself a contracting party.

Aviva's remaining arguments rest on that same fundamental premise – that it was the US Branch of General Accident and not the alien insurer itself that contracted with Powell between 1955 and 1977. Aviva further argues that the original affiliation between General Accident (n/k/a Aviva) and its US Branch was extinguished in December of 1981 when General Accident sold its US Branch through a domestication and merger agreement with its subsidiary, Potomac. Specifically, Aviva avers that Potomac "agreed to assume the liabilities of and merge with" the US Branch. (Doc. 57, ¶¶ 3-5; *see also* Docs 57-1, 57-2, 110 (Domestication Agreement and Instrument of Transfer and Assumption between General Accident and Potomac and Amendment No. 1 thereto)).

Other Declarations focus on the post-1981 evolution of Potomac. After the 1981 merger, Potomac changed its name to General Accident Ins. Co. of America. (Doc. 57, ¶ 6, PageID 775). Following several intervening name changes in 1999 and 2001, General Accident Ins. Co. of America became Bedivere Insurance Company in 2015. (*Id*. at ¶¶6-7; see also Doc. 57-3 and 57-4). As previously stated, Bedivere continued to defend Powell as an acknowledged successor under the Policies until it ran out of money in 2019.

Under the applicable standard of review, this Court will accept statements in an Affidavit or Declaration only if those statements are consistent with the complaint and are not undermined by evidence submitted by the Plaintiff. *See Peters Broadcast Engineering, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 438 (6th Cir. 2022) (holding that a court must view "the pleadings and affidavits in a light most favorable to the plaintiff and not weigh 'the controverting assertions of the party seeking dismissal.'") (additional citation omitted). Here, Aviva's assertion that an <u>entirely separate entity</u> known as the "US Branch" issued the Policies cannot be accepted under Rule 12(b)(2). On their face, the Policies reflect that they were issued by General Accident Fire and Life Assurance Corp., Ltd. (the "General Accident" alien insurer) with no reference to or hint that they were issued by a wholly distinct entity known as the "US Branch" or any other entity.[6] (Doc. 43-1; *see also* Doc. 43, ¶¶ 22, 26). In short, Powell has carried its burden to establish a *prima facie* basis for specific personal jurisdiction over General Accident. And because Aviva admits that it is the same entity formerly known as General Accident, the Court also has personal jurisdiction over Aviva.

Aviva offers one more justification for ignoring the name clearly identified as the Selling Insurer on the contracts, urging this Court to consider New York Insurance Law when the US Branch was first established in 1899. Aviva is careful not to claim that its US

---

[6]In its reply memorandum, Aviva points to the fact that the Policies reference General Accident's location as Philadelphia, PA rather than Perth. But the fact that some personnel from the US Branch may have signed the Policies as agents of, or on behalf of, General Accident is not evidence that the contracting party was other than General Accident, and arguably undercuts rather than reinforces Aviva's contention that the US Branch (an entity name not referenced in the Policies) was the Selling Insurer.

Branch was actually a separate corporation; it clearly was not. *See Greenbaum v. Handelsbanken*, 26 F. Supp. 2d 649, 652 (S.D.N.Y.1998) ("[T]he law seems fairly well-settled that the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law."). But Aviva insists that New York Insurance Law still "treated" it as if it were a separate corporation.

In Aviva's view, only its US Branch, and not General Accident itself, had the ability to contract with U.S. citizens. But neither the statutory language nor the case law mandate so narrow an interpretation. The New York statute under which General Accident was permitted to operate in the U.S. provides that an alien insurer must maintain securities or other property deposited in trust for the protection of U.S. policyholders and creditors. *See* NYIL § 1315. The statute explicitly permits an alien insurer to operate in the U.S. so long as it holds sufficient assets in trust in the U.S. for the benefit of US policyholders. But the statutory language does not treat a "US Branch" as anything other than part and parcel of the alien insurer – a mere "business unit." In fact, other provisions explain that if the assets held in trust by "the alien insurer" (not its US Branch) fall below what the Superintendent of Insurance deems to be sufficient to protect U.S. policyholders, the Superintendent shall "order the [alien] insurer, *through its United States manager or attorney*, to eliminate such impairment within such period as he designates…." *See* NYIL § 1312(c)(1) (emphasis added). In other words, the insurance law permits the New York Superintendent of Insurance to reach across oceans to direct the alien insurer to deposit greater assets on American shores if deemed necessary to protect U.S. policyholders.

12

And if the alien insurer itself is deemed to be insolvent, the superintendent may revoke or suspend the alien insurer's license to do business in the state. *See* NYIL § 1309.

The undersigned also rejects Aviva's position that two New York cases support its interpretation that its "US Branch" and not General Accident itself was the insurer on the Policies. In those cases, which date back nearly a century, the New York courts were resolving a very different issue: whether an alien insurer that has placed assets in trust for the benefit of U.S. policyholders under the New York statute can take back those assets to use for the benefit of its foreign operations. In *Matter of People by Stoddard, Norske Lloyd Ins. Co.* ("*In re Stoddard*"), 242 N.Y. 148 (N.Y. 1926), for example, a Norwegian insurer became insolvent, with liquidators appointed *both* in England and in New York. The court held that the assets held in trust by the U.S. liquidator could not be used to benefit policyholders outside the United States. The state court reasoned that the primary purpose of the New York statute that permitted the Norwegian entity to do business in the U.S. was to "protect the American branch." In that respect, the law permitted "[a]n insurance company authorized to do business [in the United States] …*for many purposes* [to be] treated as a domestic company," meaning that the assets of the "domestic" portion of the company were not up for grabs to satisfy claims arising from policies written abroad. *Id.*, 242 N.Y. at 152. (emphasis added).

The second case relied upon by Aviva, *Moscow Fire Ins. Co. v. Bank of New York & Trust Co.,* 280 N.Y. 286 (1939), involved facts so "unprecedented" as to defy "strict logical application of juristic concepts." *Id.*, 280 N.Y. at 299. After the Bolshevik revolution in 1918, the Russian government terminated the existence of a Russian insurer and

13

declared its assets to be property of the state. Despite the fact that the Russian insurer had ceased to exist in Russia, its U.S. "branch" representatives continued to transact business until 1925, when the N.Y. Superintendent of Insurance took possession of the U.S. assets and paid out claims to the U.S. policyholders. The *Moscow Fire* case considered what to do with remaining surplus funds in light of an evolving geopolitical landscape. From 1925-1933, Russia's decrees declaring the now-defunct Russian insurer's property to be state property were not recognized by the U.S. government. So New York started to divvy up the surplus under its own state law without recognition of Russia's asserted interest. But before distribution, in 1933, the U.S. recognized Russia's new government and its corresponding previously-unrecognized claim to the surplus. Citing the *Stoddard* case and working its way through intricacies of both international and state law, the New York court rejected Russia's retroactive claim of ownership of the surplus assets of the U.S. Branch. The New York court reasoned that the former Russian insurer's U.S. operations should be treated similarly to a separate U.S. corporate entity, and that the alien insurer (which again, had ceased to exist), could not take back assets specifically held in trust for U.S. policyholders.

In favor of a corresponding rule that a US policyholder cannot reach beyond whatever limited assets may be held in trust for the US policyholders under New York law, Aviva argues that "[it would make no sense if this boundary…worked only one way." (Doc. 72, PageID 1082). I disagree. *Stoddard* and *Moscow Fire* clearly hold only that the statute protects the property interests of U.S. citizens over the interests of non-citizens; they most certainly do not stand for the opposite proposition, that an alien insurer may

14

safeguard its reserves (*without any formal separation of corporate structure*) if the funds placed in trust for US policyholders prove insufficient to pay claims. To the contrary, as noted, New York Insurance Law permits the Superintendent to direct the alien insurer to funnel more funds from the alien entity to be placed in trust for U.S. policyholders whenever necessary. Thus, "[a]t most, *Moscow Fire* and *Stoddard* establish that domestic branches of foreign corporations are considered separate organizations for purposes of distribution of the property of the domestic branches…." *Colonia Ins., A.G. v. D.B.G. Property Corp.*, No. 89 Civ. 8640, 1992 WL 204376 at *7 (S.D.N.Y. Aug. 10, 1992).

Not only are *Stoddard* and *Moscow Fire* distinguishable on their facts, but much of the language on which Aviva relies is *dictum*. Other case law strongly supports a contrary interpretation. *See e.g.*, *Colonia*, 1992 WL 204376 (holding that a domestic branch of an insurer that had not been separately incorporated was not a separate entity that must be named as a party under Rule 19, but was part of German insurance corporation with which it was affiliated). In addition, and regardless of the New York statute that required it to place certain assets in trust for the benefit of U.S. policyholders, Powell has plausibly alleged that it actually contracted with the alien insurer, General Accident. The Policies permitted the insured to choose among several entities as insurers, including Potomac (the wholly owned U.S. subsidiary into which General Accident's U.S. assets were later transferred). The Policies reflect that Powell, an Ohio corporation authorized to do business in Ohio, chose to contract with the alien insurer, General Accident, and not a separate entity called the "US Branch."

15

Powell also has submitted evidence that General Accident had legal authority to transact business in Ohio, without limitation or restriction that would restrict the authority of its "US Branch" agents in Pennsylvania. (Doc. 64-1, public notice indicating that General Accident "is authorized … to transact in this state [of Ohio] its appropriate business of insurance.").[7] And, while Aviva asks this Court to take judicial notice of certain statements contained in A.M. Best's Insurance Reports (Doc. 56 , PageID 754), Powell offers an excerpt from the same publication that clearly states that, as a foreign insurer, the funds listed on General Accident's [foreign] balance sheet are available to cover losses incurred by its US operations. (Doc. 58-5, PageID 864).

That the 1981 domestication documents reflect that it was General Accident, and not the allegedly "separate" US Branch, that transferred U.S. assets and liabilities to Potomac in 1981 adds to the Court's conclusion that General Accident and its US Branch were not so separate as to wholly insulate the alien General Accident from liability under the Policies. On its face, the domestication agreement states that General Accident itself is "engaged in the business of writing insurance and is licensed to do business in the State of New York," and "for many years has maintained a [US] Branch" that is maintained "as a separate business unit with a separate set of books and record" and an office in Pennsylvania. (Doc. 110, PageID 1932). In other words, even the domestication agreement acknowledges that General Accident itself was licensed to sell insurance. The

---

[7]Aviva protests that this Court should not consider the public notice, arguing that it constitutes "new facts not alleged in the complaint." But under Rule 12(b)(2), Powell is not permitted to rest on its complaint and is permitted to respond to Aviva's proffer of countervailing evidence.

reference to the US Branch does not indicate in any way that it is a separate corporation, but only that it has been operated by General Accident as a separate "business unit" that is still part of the larger alien insurer's global operations.

Construing all reasonable inferences in favor of Plaintiff, and disregarding Aviva's controverting assertions, the undersigned therefore rejects Aviva's assertion that General Accident was not the Selling Insurer. Whatever mergers or name changes happened after General Accident sold the Policies to Powell do not detract from the fact that Powell has established personal jurisdiction over General Accident (and by extension, over Aviva), based on the original sale of the Policies in Ohio.

### B. Aviva's Rule 12(b)(6) Challenge to Powell's Statement of its Claims

#### 1. Standard of Review

Aviva also seeks dismissal for failure to state a claim under Rule 12(b)(6). Before addressing Aviva's arguments, the undersigned considers the scope of review under Rule 12(b)(6). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), plaintiffs' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Unlike under Rule 12(b)(2), matters outside the pleadings generally are not considered under Rule 12(b)(6). Instead, the Court must "construe the complaint in the

17

light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.,* 508 F.3d 327, 336 (6th Cir. 2007). While such determination rests primarily upon the allegations of the complaint, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin Coll.,* 259 F.3d 493, 502 (6th Cir.2001) (quoting *Nieman v. NLO, Inc.,* 108 F.3d 1546, 1554 (6th Cir.1997)) (emphasis omitted). Given the liberal pleading standards of Rule 8 and the standard of review under Rule 12(b)(6), it is unsurprising that cases are not often dismissed for "failure to state a claim upon which relief can be granted."

Powell argues that under the relevant Rule 12(b)(6) standard, this Court should not consider the signed copies of the domestication and merger documents recently filed as exhibits by Aviva. (*See* Doc. 112). But the amended complaint directly alleges that "General Accident purported to transfer its U.S. based assets to Potomac" in 1981, and that Potomac assumed liabilities under the Policies in the domestication agreement, without any notice to or corresponding release by Powell. (Doc. 43, ¶¶ 30-32). Because it is integral to the complaint and its authenticity is not seriously in question,[8] the domestication and merger documents tendered by Aviva may be considered. However, in so doing, the undersigned remains cognizant of the fact that no discovery has been conducted on any additional related documents concerning the corporate structure of

---

[8]On this issue, the undersigned agrees with Aviva. (See, e.g., Doc. 72, PageID 1090-1091).

18

General Accident, either before or after the 1981 transaction involving General Accident's US Branch assets and Potomac.

### 2. Powell's Allegations Adequately Plead Claims Against Aviva

Aviva asserts that on their face, Powell's allegations fail to state any viable claims. I disagree.

Under Ohio law, a breach of contract claim requires: "(a) the existence of a contract; (b) performance by the plaintiff; (c) breach by the defendant; and (d) damage or loss to the plaintiff." *Thomas v. Publishers Clearing House, Inc*., 29 Fed. Appx. 319, 322 (6th Cir. 2002). Under notice pleading standards, the allegations of Powell's complaint easily state a claim for breach of contract by the Selling Insurer, General Accident, with which Powell contracted for defense and indemnity. By extension, Powell has adequately alleged privity and a breach by Aviva, because Powell alleges and Aviva itself acknowledges it was formerly known as General Accident. Copies of the Policies (existence of the contracts) are attached to the complaint. Also attached to the complaint is Powell's request for defense and indemnity coverage from Aviva, as well as Aviva's formal response denying coverage. (*See*, *e.g*., Doc. 43-3, denying that Aviva is a successor in interest under the Policies "because the US business of General Accident…, of which the Policies formed part, was sold in 2001.").[9]

The undersigned finds equally unpersuasive Aviva's contention that Powell has failed to allege sufficient facts to establish standing to assert a declaratory judgment

---

[9]In its motion to dismiss, Aviva focuses its arguments on the 1981 domestication agreement rather than the 2001 sale.

claim. Powell has adequately alleged that it is facing more than 27 million dollars in claims against it, plus ongoing defense costs, for which General Accident/Aviva is obligated under the Policies. In addition, because defense costs could conceivably exceed the relief obtained under Powell's breach of contract claim standing alone, the undersigned declines to recommend dismissal of that separate claim as duplicative.

### 3. Aviva is not Otherwise Entitled to Judgment Under Rule 12(b)(6)

Aviva's primary argument in support of dismissal under Rule 12(b)(6) is that Powell's claims "are barred as a matter of law" because Powell contracted exclusively with its US Branch, a business unit that Aviva argues should be treated for all purposes as an entirely separate corporation. But even if – as the undersigned has concluded - the two entities were not entirely separate and Powell has adequately pleaded that General Accident/Aviva itself was the Selling Insurer, Aviva argues that the 1981 domestication and merger agreements "conclusively terminated" any liability "that could theoretically have succeeded to" Aviva. (Doc. 56 at PageID 759). In other words, even though the US Branch of General Accident was not a distinct corporation when General Accident sold the Policies, the alien insurer successfully cut off any pre-existing liability to U.S. policyholders when it transferred all of its U.S. business at the end of 1981 to its distinct U.S. corporate subsidiary, Potomac. According to General Accident, the domestication and merger agreement transferred both assets and liabilities to the newly separate corporation.

Again, the undersigned rejects Aviva's arguments as unpersuasive, though without prejudice to renew the arguments on summary judgment if appropriate. On its face, the

1981 domestication and merger agreements reflect General Accident's sale of all assets of its "US Branch" to General Accident's wholly owned corporate U.S. subsidiary, Potomac, under Pennsylvania and New York law. In exchange, the U.S. corporate entity Potomac assumed all of the liabilities of the US Branch of General Accident. Thus, the documents reflect General Accident's departure from the U.S. market through corporate restructuring that transferred its U.S. assets into a wholly-owned but separate U.S. corporation. So after 1982, General Accident no longer sold insurance to U.S. Policyholders directly under its own name.

But that does not mean that the domestication agreement and "merger" (which technically was merely the transfer of U.S. assets since the "branch" was not a separate corporation) insulated General Accident from all prior liabilities. The assumption of liabilities under the Policies by Potomac made Potomac liable to General Accident but could not fully extinguish General Accident's obligation to Powell. As Powell puts it, under basic principles of contract law, Aviva could not "relieve itself of its contractual liabilities to Powell simply by contracting" to sell off its U.S. assets and liabilities "without obtaining Powell's consent." (Doc. 64 at PageID 898; *see also id*., at PageID 921-927). And Powell (which had no formal notice of the domestication) did not give that consent.

Aviva maintains that no consent was required under the New York Insurance Law domestication statute, which requires New York regulators to determine that "the interests of policyholders and creditors of the United States branch are not materially adversely affected" prior to approving a domestication transaction. *See* NYIL § 508 (now NYIL § 7204(b)). But the undersigned cannot agree that the mere fact that a regulator must

21

approve a domestication agreement is effective to terminate the contractual rights of all policyholders who previously contracted *directly* with the alien insurer, General Accident, without so much as notice to them and without their consent or any type of novation of the transfer of the Policies. If that had been the statute's intention, it could have been more plainly stated. In the face of statutory silence on the issue, and with no controlling case law directly on point, the undersigned declines to adopt a construction that would impose such enormous negative ramifications on U.S. Policyholders who previously contracted directly with an alien insurer. *See*, *generally*, *e.g.*, *ABN AMRO Bank, N.V. v. MBIA Inc.*, 952 N.E.2d 463 (N.Y. 2011) (regulator's approval did not preempt insureds' claims or have collateral estoppel effect); *Vetter v. Security Continental Insurance Co.*, 567 N.W.2d 516, 519-522 (Minn. 1997) (holding that assumption of liabilities did not amount to novation and was not effective to terminate rights against the original insurer).

Aviva next argues that Powell ratified and consented to the transfer of its Policies by its course of conduct in accepting defense and indemnity coverage from Bedivere for roughly 19 years through 2019. Despite some equitable appeal, the undersigned rejects this argument as well. Aviva cites to no authority that permits this Court to presume Powell's novation. *Contra Moneywatch* Cos. *v. Wilbers*, 106 Ohio App. 3d 122, 125, 665 N.E.2d 689, 691 (1995) ("A novation can never be presumed."). Again, based on principles of contract law, an obligee may accept performance from a third party without losing its rights to pursue relief against the original obligor. *See generally*, Restatement (Second) of Contracts § 318, comment D, illustration 10 (1981). Because General Accident was the original insurer, and never obtained Powell's express consent or

novation of its transfer of the Policies to Potomac (n/k/a Bedivere), Powell never gave up its legal right to pursue alternative relief directly from its original insurer, General Accident.

### C. *Burford* Abstention

The last argument that Aviva offers in support of dismissal is based on *Burford*[10] abstention – which technically would favor no more than a stay of proceedings rather than dismissal. But *Burford* abstention makes sense only if Powell is limited to pursuing its claims against Bedivere. As discussed, the undersigned rejects the premise that the restructuring and sale of General Accident's US based business into Potomac (n/k/a Bedivere) was effective to re-make the contract without Powell's consent. At this early stage of proceedings, Powell has adequately pleaded a claim for relief directly from the entirely separate and solvent alien insurer, General Accident/Aviva. The Pennsylvania liquidation proceedings against Bedivere, a separate corporate entity, are not directly impacted by this Court's proceeding between Powell and General Accident.[11]

### D. Cross-Claims

The amended cross-claims are wholly dependent on Powell's claims. For the reasons discussed, the undersigned recommends the denial of Aviva's motion to dismiss the cross-claims as well as Powell's amended complaint.

### III. Conclusion and Recommendation

Accordingly, **IT IS RECOMMENDED THAT:**

---

[10]*Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098 (1943).
[11]Liquidation is a lengthy process. As of this writing, the Pennsylvania proceedings appear to be ongoing.

Aviva's motion to dismiss Powell's amended complaint and related cross-claims (Doc. 56) be **DENIED**.

_s/Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

THE WILLIAM POWELL COMPANY,                    Case No. 1:21-cv-522

             Plaintiff,                               Hopkins, J.
                                                 Bowman, M.J.

    v.

AVIVA INSURANCE LIMITED, et al.,

             Defendants.

**NOTICE**

Under Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

25